**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division**

| | |
|---|---|
| ERNEST MELO, on behalf of himself and all others similarly situated, | ) |
| | ) |
| Plaintiff, | ) |
| v. | ) |
| | ) |
| ZUMPER, INC., | )    Civil Action No. 3:19-cv-00621-REP |
| | ) |
| and | ) |
| | ) |
| TRADE HOUSE DATA, | ) |
| | ) |
| Defendants. | ) |
| | ) |

**DEFENDANT ZUMPER INC.'S MEMORANDUM IN SUPPORT OF ITS MOTION TO
TRANSFER VENUE AND TO STAY PROCEEDINGS PENDING ARBITRATION**

**Introduction**

Defendant Zumper, Inc. operates a residential real estate rental website that plaintiff Ernest Melo used to apply to rent a condominium.  Mr. Melo alleges that, after he ordered a background report for the rental application, Zumper gave the landlord adverse information that related not to himself but his father.  Melo proposes a national class action against Zumper under the federal Fair Credit Reporting Act.

Zumper now moves to transfer this action to the U.S. District Court for the Northern District of California based on Mr. Melo's agreement to exclusive venue in that court when he created his Zumper account and accepted its terms and conditions.  Alternatively, Zumper seeks transfer based under 28 U.S.C. § 1404(a) based on considerations of efficiency and the interests of justice.  These include consolidation with an earlier proposed class action in the Northern District asserting similar claims filed by one Luis A. Gonzalez-Torres, the lack of deference to

Mr. Melo's choice of forum for a proposed national class action, and the location of all Zumper's witnesses and documents at its headquarters in San Francisco.  Indeed, even if Melo had not agreed to Zumper's terms, the case should be transferred for these reasons alone.

Zumper also moves for a stay of the action pending arbitration, to which Mr. Melo also agreed by creating his Zumper account, as mandated by the Federal Arbitration Act, 9 U.S.C. §§ 1 *et seq.*  However, the Court need not reach this issue if the case is transferred.  The Court may prefer not to do so, given that a closely similar arbitration motion based on essentially the same facts is pending in the referenced *Gonzalez-Torres* action, and it would be more efficient for both motions to be decided by the same judge.  This is especially so in this case because a judge in the Northern District may not only stay the case, but issue an order compelling arbitration in San Francisco, the designated seat of arbitration.

### Factual and Procedural Background

#### *The Plaintiff Created a Zumper Account*

Zumper is a corporation organized under Delaware law with a principal place of business in San Francisco, California.  Affidavit of Brian Coyne ("Coyne Aff.") ¶ 2.  Zumper provides a marketplace throughout the United States and Canada in which prospective renters can search for rental apartments and connect with landlords and realtors offering rental apartments, and landlords can communicate with and evaluate potential tenants.  *Id.*  Zumper does this through its website, www.zumper.com.  *Id.*  One of the services that Zumper provides on its website is to obtain credit, criminal, and eviction reports from third parties for transmission to prospective landlords when prospective tenants have so requested.  *Id.*  In order to take advantage of that service, and other features of the Zumper website, a user has to create an account.  *Id.* ¶ 4.

Melo alleges that, in August 2017, he applied to rent a condominium.  Cmplt. ¶ 13.  He alleges that the leasing agent requested his "consumer report" through Zumper's online tenant

screening resource.  *Id.* ¶ 14.  These allegations are consistent with Zumper's records, including an email dated August 28, 2017 that Zumper sent to the address "ernest.melo@outlook.com."  Coyne Aff. ¶ 6.  That email informed Melo that "Nate Johnson [a realtor] has asked you to create a Credit Report and to run a background screen on you," and included a blue button with the words "Get Started."  *Id.* ¶ 7 and accompanying screenshot.

Tapping on the "Get Started" button opened a webpage repeating that "Nate Johnson has asked to view your Credit Report."  *Id.* ¶¶ 8-9 and accompanying screenshot.  The webpage included a pink button labelled "Create an Account."  *Id.* ¶ 9 and accompanying screenshot.  Tapping the pink button would have caused a pop-up window to appear that directed the user to create an account by entering his full name and a password and eventually tapping either a button labelled "Create Account" or one labelled "Continue with Facebook."  *Id.* ¶¶ 10-11.  Zumper's records show that Melo created an account by tapping the "Create Account" button at 6:55 p.m. Eastern Daylight Time (3:55 p.m. Pacific Daylight Time), on August 28, 2017.  *Id.* ¶¶ 18, 23.  Zumper's records also show that Melo used a Samsung Galaxy S8 phone and the Google Chrome web browser to do so.  *Id.* ¶ 24.  An image of the account creation window, as it would have appeared on Melo's Samsung Galaxy S8 in the Google Chrome web browser, appears on the following page[1]:

---

[1] The Samsung Galaxy S8 has a screen size measuring 5.8 inches (diagonally).  Coyne Aff. ¶ 7 n.1 & Ex. A.  The screenshot in this brief (as it appears here and below) has been sized to match that screen size as closely as possible when printed on standard letter size paper.



*Id.* ¶ 11 and accompanying screenshot.

As it appeared in August 2017, below the mandate to "Create Account," the account creation window pictured above included text boxes for the user's full name, email address, and password (and a second box to confirm the password).  *Id.*  Below the text boxes was a blue button with the words "Create Account" in white text (which Melo used), and a white button with the words "Continue with Facebook" in blue text.  *Id.* ¶¶ 11, 18 n.4.  Immediately below those buttons was a sentence reading "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy."  *Id.* ¶ 11 and accompanying screenshot.  The words "Terms and Conditions" and "Privacy Policy" appeared in blue, whereas

the rest of the sentence (including the word "and" between the two blue phrases) appeared in black.  *Id.*  The sentence was in the same size font as the prompts for the user's name, email address, and password.  *Id.* ¶ 13; *see also id.* ¶ 11 accompanying screenshot.  The text of the "Create Account" button, by comparison, appeared in a semi-bold, but slightly smaller font.  *Id.* ¶ 13.  The sentence noting agreement to the terms and conditions (and the entirety of the account creation window) was immediately visible and did not require any scrolling to read.  *Id.*

The words "Terms and Conditions" and "Privacy Policy" appeared in blue to indicate to the user that they were hyperlinks.  *Id.* ¶ 14.  Tapping on "Terms and Conditions" would have caused the web browser to redirect to another page on the Zumper website (www.zumper.com/terms-of-use) where Melo could have read Zumper's terms.  *Id.* ¶ 15.  (The caption on the linked agreement was "Terms of Use," but it referred to itself in its first paragraph as "terms and conditions."  *See id.*, Ex. D.)  Similarly, tapping on "Privacy Policy" would have caused the web browser to redirect to another page on the Zumper website (www.zumper.com/privacy-policy) where Melo could have read Zumper's privacy policy.  *Id.* ¶ 16.  Furthermore, the links to both the terms and privacy policy appeared at the bottom of every page of the website.  *Id.* ¶¶ 15-16.

It was Melo's choice whether or not to read the terms when creating his account.  *Id.* ¶ 18.  But whether or not he chose to read those policies, he could not create an account until he proactively decided to tap on the "Create Account" button appearing above the hyperlinks to the terms and privacy policy and the language informing him that "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy."  *Id.*

Because Melo created his account using a mobile phone, after he touched a box to begin entering his name, email address, or password, a software keyboard would have appeared and

partially obscured the account creation window, including the sentence about acceptance of the terms. *Id.* ¶ 19. But this would have occurred only **after** the language stating that creation of an account "indicate[d] your acceptance of our Terms and Conditions" was visible to Melo and **after** he had chosen whether or not to view the linked terms. *Id.*

### *By Creating a Zumper Account, the Plaintiff Agreed to Zumper's Terms*

Zumper's records show that Melo created an account on August 28, 2017, providing the full name of Ernest Martin de Jesus Melo. *Id.* ¶ 20. (Zumper's records do not indicate any other users with the name "Ernest Melo." *Id.* ¶ 21.) Ten minutes after creating his account, Melo used the Zumper website to share his credit and background reports with another website user (a realtor), for which service he paid $50 by credit card. *Id.* ¶¶ 32-33.[2]

By creating an account, Melo necessarily agreed to the terms posted on the Zumper website. *Id.* ¶ 25. Those terms, as they existed on August 28, 2017, included agreement to binding arbitration in San Francisco (unless deemed by the arbitrator not to be reasonably convenient to all parties) and, to the extent any claims were not arbitrable, and other than as to small claims, exclusive venue in the federal or state courts in San Francisco. Section 14 (entitled "Arbitration and Dispute Resolution") provided:

> All disputes arising out of or relating to this Agreement, the Website or the Services shall be resolved exclusively by binding arbitration before a single arbitrator (the "Arbitrator") in accordance with the Commercial Arbitration Rules of the American Arbitration Association (the "AAA") then in effect (for information on the AAA and its rules, see www.adr.org.) and the further procedures set forth herein, except that each party retains the right to seek injunctive or other equitable relief in a court of competent jurisdiction to prevent

---

[2] Melo was required to agree to an additional set of terms when he requested his credit and background reports (not all users make that request). Coyne Aff. ¶¶ 32-34. This occurred only after he agreed to Zumper's general terms by creating an account. *Id.* ¶ 35. Nothing in the second set of terms (which relate to the ordering of credit reports) purports to amend or displace the general terms. *Id.* ¶¶ 36-38.

the actual or threatened infringement, misappropriation or violation of a party's copyrights, trademarks, trade secrets, patents or other intellectual property rights. The arbitration shall be conducted in San Francisco, California, unless the Arbitrator shall determine that that venue is not reasonably convenient to all parties, in which case the Arbitrator shall determine another venue that is. In the event that the AAA is unavailable or unwilling to administer the arbitration, and the parties are unable to agree to a substitute, a substitute shall be appointed by the court. The Arbitrator shall have authority to issue any and all remedies authorized by law. The arbitration shall be governed by the Federal Arbitration Act, 9 U.S.C. §§ 2 et seq. Notwithstanding any rules of the AAA to the contrary, any claims shall be adjudicated on an individual basis only, and YOU WAIVE ANY RIGHT TO BRING ANY CLAIM AS A REPRESENTATIVE OF A PROPOSED CLASS, ON AN AGGREGATED OR MASS BASIS, OR AS A PRIVATE ATTORNEY GENERAL, OR TO CONSOLIDATE ARBITRATION PROCEEDINGS WITHOUT THE CONSENT OF ALL PARTIES THERETO. Any award rendered by the Arbitrator shall be final, conclusive and binding upon the parties hereto. In connection with any arbitration proceeding pursuant to this Agreement, unless the Arbitrator shall determine otherwise, each party shall bear its own costs and expenses. Notwithstanding the foregoing, you may at your option file an individual claim in any small claims court for disputes or claims within the scope of its subject matter jurisdiction if such court has personal jurisdiction. Zumper does not hereby waive any defense that such jurisdiction may be lacking in your state. Without derogation of the parties' obligation to arbitrate as set forth herein, for any claims other than those in small claims court, jurisdiction for any court proceedings arising out of or relating to this Agreement, the Website or the Services shall be vested exclusively in, and venue shall be laid in, the state or federal courts sitting San Francisco, California except that, following confirmation of an arbitration award in a state or federal court in San Francisco, California, a judgment arising therefrom may be executed in any court of competent jurisdiction.

*Id.* ¶ 27 & Ex. D (emphasis in original).  As indicated, the Commercial Rules of the American

Arbitration Association are available on its website, www.adr.org.  *Id.* ¶¶ 27, 30 & Exs. D & E.

Zumper's terms defined "Services," as used in the arbitration clause, as "the Zumper

online real estate marketplace, including the Zumper Pro Service and the Zumper Select Service,

offered through the Website."  *Id.* ¶ 28 & Ex. D.  Section 7 of the terms further specified that

requesting and sharing credit, criminal and eviction reports, as Melo did on August 28, 2017,

was part of the "Services," as defined in the agreement, providing:

You understand that you may (i) submit electronic instructions through the Services to a Listing Party authorizing such Listing Party to obtain through

> services provided by one our third party service providers a copy of your
> consumer credit report and score, as well as reports of background investigations
> regarding your criminal and eviction history as each relates to your suitability as a
> tenant, or (ii) submit consent to a request from a Listing Party that it be authorized
> to so obtain such credit report and score or background investigation . . . .

*Id.* ¶ 29 & Ex. D.  The definition of "Listing Party" included landlords, landlord representatives,

brokers, property managers, and sublessors.  *Id*. Ex. D, § 4.

### The Plaintiff's Claims

Melo alleges that Zumper published a consumer report that included an unfavorable civil

matter that did not actually relate to him, but rather to his father, Ernesto Melo.  Cmplt. ¶¶ 16-17;

Coyne Aff. ¶ 42.  Melo alleges that this error was the result of Zumper's having failed to

maintain procedures to assure maximum possible accuracy of such reports.  Cmplt. ¶ 18.  Melo

alleges that the inaccuracy limited his ability to secure a rental property and caused him to suffer

other damages.  *Id.* ¶¶ 18-19.  Melo alleges that he then requested a copy of his consumer file

from Zumper, but Zumper did not respond.  *Id.* ¶¶ 20-21.

Although Zumper contends that the dispute must be resolved by arbitration, documents

show that Melo's key allegations are not correct.  Melo did not use the process explicitly

provided on Zumper's website for resolving issues with the accuracy of credit, criminal or

eviction reports, which, as noted, Zumper had obtained from third parties.  Coyne Aff. ¶ 40.

Melo, in fact, never requested that Zumper correct any errors.  Rather, Melo first filed a lawsuit

in this Court against one of the providers Zumper uses, Experian, over the credit report that he

had ordered through Zumper.com.  *See* Complaint, *Melo v. Experian Information Solutions, Inc.*,

No. 3:17-cv-642-REP (E.D. Va. Sep. 20, 2017).  In that case, Experian provided an affidavit

from Zumper's Chief Operating Officer, Taylor Glass-Moore, testifying that the source of

information at issue was not Experian, but rather a different vendor, Trade House Data.

Declaration of Taylor Glass-Moore, Dkt. # 35-10, *Melo v. Experian Information Solutions, Inc.*,

No. 3:17-cv-642 (E.D. Va. June 6, 2018).  The Experian case was settled.  Consent Injunctive Relief and Dismissal Order, Dkt. # 40, (July 10, 2018).

While it was still pending, however, Melo sent a letter dated May 22, 2018 "To Whom It May Concern" at Zumper requesting "a copy of all information you have in your file about me." *See* Coyne Aff. ¶ 40, Ex. H.  Because Melo did not use the website's explicit process for correction of credit report inaccuracies, did not (contrary to the present complaint) mention a "consumer" or credit file, and did not provide any indication that his request related to a consumer or credit file, Zumper believed that he was requesting a copy of an employment file. *See id.* ¶¶ 40-41, Ex. I.  Zumper responded by letter dated May 29, 2018 that it had "received a request from you asking for a copy of your employee file" but did "not have any record of you being a current or former employee of Zumper." *Id*.  Zumper postulated that "we may have received this request by mistake." *Id.*  Zumper has no record of any response. *Id.* ¶ 41.

The next communication from Melo to Zumper was his filing of a lawsuit in this Court on November 1, 2018. *See* Complaint, *Melo v. Zumper, Inc.*, No. 3:18-cv-756-REP (E.D. Va. Nov. 1, 2018).  Although Melo had been advised that Trade House Data was the source of the assertedly erroneous information in the course of the earlier Experian suit, his November 2018 complaint named only Zumper. *Id.*  As he does now, Melo alleged that Zumper had published inaccurate information due to unreasonable procedures, and that Zumper had failed to respond to his request for his "consumer" file. *Id.*  Zumper moved to stay pending arbitration and, among other things, attached Melo's letter, noting that he had not in fact requested a "consumer" file. *See* Affidavit of Brian Coyne, Ex. F, Dkt. # 10-7 (Dec. 10, 2018).  On the day that Melo's response to Zumper's motion to stay was due (after two extensions), Melo withdrew his suit without prejudice.  Notice of Voluntary Dismissal, Dkt. # 20 (Jan. 22, 2019).

After Melo withdrew that suit, on April 23, 2019, a different plaintiff, Luis Armando Gonzalez-Torres, filed a proposed class action under the FCRA against Zumper in the Northern District of California.  *See* Complaint, *Gonzalez-Torres v. Zumper, Inc.,* No. 4:19-cv-2183 (N.D. Cal. April 23, 2019), Coyne Aff. Ex. J.  Like Melo, Gonzalez-Torres alleges that Zumper published inaccurate information due to unreasonable procedures and failed to disclose the sources of its information, as well as additional claims.  *Id.*  Zumper has moved to compel arbitration in that matter and the motion is currently scheduled to be heard on October 23, 2019. Coyne Aff. ¶ 46.

On August 22, 2019, Melo filed the present proposed class action, repeating his earlier claims that Zumper published inaccurate information due to unreasonable procedures, failed to respond to his purported request for his "consumer file," failed to disclose the sources of information in his report, and failed to identify who had previously requested Melo's report. Cmplt. ¶¶ 27-32.  The present case includes a claim based on the same facts against Trade House Data, although as of this date Trade House Data has not yet been served.

<u>Argument</u>

I.      **MELO AGREED TO ZUMPER'S TERMS, INCLUDING EXCLUSIVE VENUE AND ARBITRATION IN SAN FRANCISCO.**

Because Melo agreed to Zumper's terms when he created his Zumper account, there is a written agreement both to arbitrate the present claims and, to the extent that arbitration might not apply, to exclusive venue in San Francisco.

A.      **Virginia Law Controls the Question of Whether a Valid Contract Exists.**

As an initial matter, the Court must determine which state's law governs the question of contract formation.  As here, a district court applies the choice of law rules of the forum state. *United Gov't Sec. Officers of Am. v. Special Operations Grp.*, 436 F. Supp. 2d 790, 792 (E.D.

Va. 2006).  In the absence of a choice of law clause, Virginia applies the law of the place where the contract was made.  *See, e.g., Black v. Powers*, 628 S.E.2d 546, 554 (Va. App. 2006).  In this case, that would be Virginia, where Melo allegedly resides, Cmplt. ¶ 6, and where he presumably was located when he created the Zumper account and in so doing agreed to Zumper's terms. While Zumper's terms chose California law, Coyne Aff. Ex. D, § 13, and "Virginia law looks favorably upon choice of law clauses in a contract," *Hitachi Credit*, 166 F.3d at 624 (citation omitted), if Melo contends that he never agreed to those terms, the choice of law clause should not govern the threshold question of whether a contract was formed in the first place.  *See Pyott-Boone Elecs., Inc. v. IRR Tr. for Donald L. Fetterolf Dated December 9, 1997*, 918 F. Supp. 2d 532, 542-43 (W.D. Va. 2013).

### B.    General Principles of Contract Formation Apply.

The question of whether the parties have made a contract is determined by ordinary state law contract principles.  *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995).  In Virginia, as elsewhere, offer, acceptance, and consideration are the essential elements of a contract.  *A.V. v. iParadigms*, 544 F. Supp. 2d 473, 480 (E.D. Va. 2008), *rev'd on other grounds*, 562 F.3d 630 (4th Cir. 2009).  Acceptance is determined objectively, from the party's words and acts.  *Phillips v. Mazyck*, 643 S.E.2d 172, 175 (Va. 2007); *see also Green's Ex'rs v. Smith*, 131 S.E. 846, 848-49 (Va. 1926).  The general principles of contract formation do not change when the contract is made by means of a computer.  *iParadigms*, 544 F. Supp. 2d at 480.

### C.    Zumper's Account Creation Process Formed a Binding Contract.

#### 1.    *Melo Had at Least Constructive Knowledge of Zumper's Terms and Took an Affirmative Act Indicating His Agreement to Them.*

In the present case, Zumper offered the use of its website and the services provided thereon, but made the offer subject to acceptance of its terms.  In considering whether website

terms create a valid contract, this Court has articulated the standard as whether the user "had actual or constructive knowledge of the site's terms and conditions" and "manifested assent to them." *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 937 (E.D. Va. 2010) (addressing website that made terms available for user's review but did not require affirmative act of assent).

The process by which Melo created an account with Zumper provided at least constructive knowledge of the Zumper terms. As described above, the website directed the user to create an account, and the page on which to do so, in font the same size or larger than other relevant text, expressly informed the user that "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy." Coyne Aff. ¶¶ 10-13 and accompanying screenshot. The words "Terms and Conditions" were a hyperlink (as indicated by the blue text color) that, if tapped, took the user to Zumper's written terms. *Id.* ¶¶ 14-15. Those terms expressly provided that "All disputes arising out of or relating to this Agreement, the Website or the Services shall be resolved exclusively by binding arbitration . . . ." *Id.* ¶ 27 & Ex. D. These and other mutual promises constituted consideration. *See Adams, Payne & Gleaves, Inc. v. Ind. Wood Preserving Co.*, 154 S.E. 558, 562 (Va. 1930).

Melo manifested assent to the terms. After being presented with the language indicating that "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy" and having an opportunity to read the linked terms, Melo affirmatively entered his information and tapped the "Create Account" button. *See* Coyne Aff. ¶¶ 12, 23.

> 2.  *The Second Circuit Has Held that Parties Made a Valid Contract in Nearly Identical Circumstances.*

The means by which Zumper solicited and received Melo's acceptance of the terms is common in the digital era. Numerous courts have enforced agreements in cases presenting varying degrees of factual similarity. In the most directly comparable appellate case, the Second

Circuit recently reversed a lower court and held that a user had made a valid contract with Uber Technologies, Inc. when he created an account on the company's mobile phone application. *See Meyer v. Uber Techs., Inc.*, 868 F.3d 66 (2d Cir. 2017). There the user plaintiff downloaded and installed the defendant's mobile phone application, and then registered an account. *Id.* at 70. The account registration process involved a "payment screen," on which the user was prompted to enter a credit card or select a third-party payment service and click a button marked "REGISTER" to complete the process. *Id.* at 70-71. Below the "REGISTER" button, and below the options to select third-party payment services, the screen included text in a smaller font stating that "By creating an Uber account, you agree to the TERMS OF SERVICE & PRIVACY POLICY." *Id.* The capitalized terms appeared in blue and were hyperlinks to the current versions of the defendant's terms of service (containing an arbitration clause) and privacy policy. *Id.* The plaintiff claimed not to recall seeing the hyperlink or reading the terms. *Id.* at 71.

The Second Circuit held that Uber provided reasonably conspicuous notice of its terms and that the plaintiff's completion of the account creation process was an unambiguous manifestation of assent. *Id.* at 78, 80 (applying California law). The court identified several design elements supporting this conclusion:

- The screen was uncluttered and had limited buttons, fields and text;

- The screen was fully visible without scrolling;

- The text notifying the user about agreement to the terms of service was clearly visible, in a color that contrasted with the background;

- The notification text appeared directly below the buttons for registration;

- The hyperlink to the terms of service was in blue and underlined; and

- The notice of the terms of service was "provided simultaneously to enrollment, thereby connecting the contractual terms to the services to which they apply."

*Id.* at 78-80; *see also id.* at 81 (screenshot of relevant screen).

Zumper's terms were, if anything, presented to Mr. Melo even more clearly than Uber's terms were presented to Meyer.  Below are reproduced side by side, to the scale of the handheld device screens actually employed, the "Create Account" screen of Zumper and the "Register" screen of Uber:

 

*Id.* at 81; Coyne Aff. ¶ 11.[3]

---

With regard to viewing the Create Account button and accompanying text, Melo enjoyed a larger screen, 5.8 inches measured diagonally, Coyne Aff. ¶ 7 n.1, whereas the *Meyer* plaintiff's screen was only 5.1 inches measured diagonally.  *Meyer*, 868 F.3d at 71 n.2.  More critically, Zumper's text stating that "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy" is in a much larger font and is far more legible than Uber's statement that "By creating an Uber account, you agree" to its terms and privacy policy.  Moreover, in *Meyer*, the user had to tap twice (past two webpages) to reach the terms for review, *id.* at 71, whereas here Melo could have reviewed the terms after a single tap on the terms and conditions hyperlink, Coyne Aff. ¶ 15.

Other differences between the two interfaces also favor Zumper.  Unlike as in *Meyer*, Zumper's "Create Account" terminology tied verbatim to the statement that creating an account constituted agreement to Zumper's terms.  Coyne Aff. ¶ 11 & accompanying screenshot.  In *Meyer*, the button said "Register," while the operative statement referred to creating an account as the means of agreement.  *Meyer*, 868 F.3d at 80.  Furthermore, unlike as in *Meyer*, the text warning about agreement to the Zumper terms appeared in the same size font as the other relevant text, and in a slightly larger size font than the text of the "Create Account" button (although "Create Account" in the button is semi-bolded).  Coyne Aff. ¶ 13; *cf. Selden v. Airbnb, Inc.*, 2016 U.S. Dist. LEXIS 150863, *15, 26 (D.D.C. Nov. 1, 2016) (describing a notice appearing in font smaller than Zumper's as "appropriately sized"); *contrast Berkson v. GoGo LLC*, 97 F. Supp. 3d 359, 404 (E.D.N.Y. 2015) (finding statement in small size font above "NEXT" button not sufficiently conspicuous).

It is true that Zumper did not underline or capitalize the links to the terms.  But underlining is relevant only to make clear that it was a hyperlink to permit reading the terms

themselves.  The fact that "Terms and Conditions" was a hyperlink was already clearly conveyed by Zumper's use of a contrasting color commonly used for the links (blue instead of black).  *See, e.g., Payne v. Amazon.com, Inc.*, 2018 U.S. Dist. LEXIS 135020, at *12 (D.S.C. July 24, 2018) ("the words 'conditions of use' were in blue text indicating they were a hyperlink to the full conditions"); *Hubbert v. Dell Corp.*, 835 N.E.2d 113, 121 (Ill. App. Ct. 2005) ("A person using a computer quickly learns that more information is available by clicking on a blue hyperlink."); *see also Selden v. Airbnb, Inc.*, 2016 U.S. Dist. LEXIS 150863, *15, 26 (D.D.C. Nov. 1, 2016) (enforcing link in contrasting color without underlining); *contrast Colgate v. Juul Labs, Inc.*, 2019 U.S. Dist. LEXIS 144027, at *80-81 (N.D. Cal. Aug. 23, 2019) (blue hyperlink to terms not clearly a hyperlink where earlier (but irrelevant) hyperlink was in a different color, underlined, bolded, and in larger font).  And, although *Meyer* did not rely on capitalization, to the extent it may have been a factor, it was in the context of a smaller font size in relation to neighboring text.  *See Meyer*, 868 F.3d at 78.  Here, the font size of Zumper's text relating to an agreement was the same size or larger than neighboring text.  Coyne Aff. ¶ 13.

> 3.    *District Courts in this and Other Circuits Enforce Similar Agreements.*

The District Court for the District of Columbia considered another similar interface in *Selden v. Airbnb, Inc.*, 2016 U.S. Dist. LEXIS 150863 (D.D.C. Nov. 1, 2016).  In that case, the plaintiff signed up for an account with the defendant using his Apple iPhone.  *Id.* at *4-6.  The plaintiff was presented with a screen including three buttons to sign up for an account by different methods.  *Id.* at *5.  Below the three buttons was a statement reading "By signing up, I agree to Airbnb's Terms of Service, Privacy Policy, Guest Refund Policy, and Host Guarantee Terms."  *Id.*  Each of the capitalized terms appeared in red and was a hyperlink to the relevant document.  *Id.*  The terms of service included an arbitration clause.  *Id.* at *7.  The court held that the interface "adequately placed [the plaintiff] on notice of Airbnb's Terms of Service, and that

he assented to those terms by clicking the sign-up box and using the service." *Id.* at *14-15.  The court reasoned that the notice was placed roughly in the middle of the page, in close proximity to the sign-up buttons, in a dark font contrasting with the white background, and was "clearly legible, appropriately sized, and unobscured by other visual elements." *Id.* at *15.  The court also reasoned that "any reasonably-observant user would notice the text and accompanying hyperlinks." *Id.*  Zumper's presentation again compares favorably, as the text stating that creating an account indicates acceptance of Zumper's terms is both considerably larger in font size and closer to the button by which agreement is indicated.  *See id.* at *26; Coyne Aff. ¶ 11.

Moving beyond the specifics of the interface, the *Selden* court observed that:

> The act of contracting for consumer services online is now commonplace in the American economy.  Any reasonably-active adult consumer will almost certainly appreciate that by signing up for a particular service, he or she is accepting the terms and conditions of the provider.  Notifications to that effect–be they check boxes or hyperlinks–abound.  To be sure, few people may take time to actually read the user agreements.  But ignorance of the precise terms does not mean that consumers are unaware they are entering contracts by signing up for internet-based services.  So, while the record is silent as to Mr. Selden's particular history with e-commerce, the prevalence of online contracting in contemporary society lends general support to the Court's conclusion that Selden was on notice that he was entering a contract with Airbnb in this case.

*Selden*, 2016 U.S. Dist. LEXIS 150863 at *15; *see also Nicosia v. Amazon.com, Inc.*, 2019 U.S. Dist. LEXIS 100162, *51 (E.D.N.Y. June 14, 2019).  This point is particularly apt in Melo's case, because he was far more than a casual visitor to the website.  As noted, he used the Zumper site to place an order for a credit and background report and paid $50.  Coyne Aff. ¶ 32.

Similarly, in *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829 (S.D.N.Y. 2012), the court held that a forum selection clause contained in terms of use was enforceable, because the user had accepted the terms of use when he created an account.  *Id.* at 841.  That case involved the creation of a Facebook account.  *Id.* at 834.  After providing personal information, a user would arrive at a "security check" screen and need to click a button reading "Sign Up" to finish the

process.  *Id.* at 834-35.  Below that was language informing the user that "By clicking Sign Up, you are indicating that you have read and agree to the Terms of Service," with "Terms of Service" being an underlined hyperlink to the relevant document.  *Id.* at 835.  The user "was informed of the consequences of his assenting click and he was shown, immediately below, where to click to understand those consequences.  That was enough."  *Id.* at 840.

District courts within the Fourth Circuit have reached similar conclusions.  In *Church v. Hotels.com L.P.*, 2018 U.S. Dist. LEXIS 106490 (D.S.C. June 26, 2018), the court enforced an arbitration clause contained in terms of service where the checkout page included a notice next to a "Complete Reservation" button informing the user that "By clicking the 'Complete Reservation' button you agree to our Terms of Service," and included a hyperlink to the terms of service.  *Id.* at *2, 6.  The court specifically rejected the argument that the notice was inconspicuous based on its size and color, noting that "the hyperlinked disclaimer is presented in the same 'small gray font on a light gray background' as is the payment information that Plaintiff himself typed."  *Id.* at *6 n.1.

Likewise, in *Payne v. Amazon.com, Inc.*, 2018 U.S. Dist. LEXIS 135020 (D.S.C. July 24, 2018), the court considered conditions of use presented on Amazon's "submit order" page.  *Id.* at *11-15.  The page included a sentence reading "By placing your order, you agree to Amazon.com's privacy notice and conditions of use" near two "place your order" buttons.  *Id.* at *12-13.  The "conditions of use" were in blue text and were a hyperlink to the relevant document.  *Id.*  The court held that the user had notice of the conditions of use and manifested his assent to them by clicking on the adjacent "place your order" button and upheld the arbitration clause in those terms.  *Id.* at *15.  Significant to the court's analysis was the close proximity of the relevant button and the link.  *Id.* ("[A] reasonably prudent offeree would know

that he agreed to Amazon's Conditions of Use by clicking the 'Place your order' button when that button appeared directly next to or above a statement hyperlinking to conditions and the statement indicated the user agreed to those conditions by ordering."); *see also In re § 2703(d) Order*, 787 F. Supp. 2d 430, 440 n.6 (E.D. Va. 2011) ("By clicking on 'create my account,' petitioners consented to Twitter's terms of use in a binding 'clickwrap' agreement to turn over to Twitter their IP addresses and more.").  Other cases outside the Fourth Circuit have reached the same result when considering designs similar Zumper's.[4]

       4.     *Zumper's Design Does Not Have the Fatal Flaws Found in Other Cases.*

Not every website design choice has resulted in an enforceable contract.  In another case involving Uber, the First Circuit found that the design choices (different from those at issue in the Second Circuit's *Meyer* case discussed above) did not provide sufficient notice to the user that he or she was agreeing to be bound by the referenced terms and conditions.  In that case,

---

[4] *See, e.g., Crawford v. Beachbody, LLC*, 2014 U.S. Dist. LEXIS 156658, at *8-9 (S.D. Cal. Nov. 5, 2014) (enforcing forum selection clause contained in term and conditions where user clicked a button labelled "place order" immediately below language that informed the user "By clicking Place Order below, you are agreeing that you have read and understand the Beachbody Purchase Terms and Conditions, and Team Beachbody Terms and Conditions" with the words "Terms and Conditions" being blue hyperlinks to the relevant document); *Starke v. Gilt Groupe, Inc.*, 2014 U.S. Dist. LEXIS 58006, at *2, 8-9 (S.D.N.Y. Apr. 24, 2014) (enforcing arbitration clause where user clicked "Shop Now" button next to statement that informed user that he or she "will become a Gilt Member and agrees to be bound by the 'Terms of Membership'" with hyperlink to terms); *5381 Partners LLC v. Shareasale.com, Inc.*, 2013 U.S. Dist. LEXIS 136003 at *23-26 (E.D.N.Y. Sept. 23, 2013) (enforcing forum selection clause contained in Merchant Agreement hyperlink, where registration screen said that "By clicking and making a request to Activate, you agree to the terms and conditions in the Merchant Agreement" and the user clicked the referenced button); *Major v. McCallister*, 302 S.W.3d 227, 230-31 (Mo. Ct. App. 2009) (enforcing forum selection clause in terms of use where user clicked a "submit" button next to language stating "By submitting you agree to the Terms of Use" and a blue hyperlink to the terms of use); *Hubbert v. Dell Corporation*, 835 N.E.2d 113, 121-22 (Ill. App. Ct. 2005) (enforcing arbitration clause contained in terms and conditions where website included warning that "All sales are subject to Dell's Terms and Conditions of Sale" and blue hyperlinks entitled "Terms and Conditions of Sale" appeared on numerous pages throughout ordering process).

decided under Massachusetts law, the First Circuit reviewed the design features of two versions of screens visible in a mobile phone application during the account registration process and held that users were not reasonably notified of the terms of service.  *Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 62 (1st Cir. 2018).

The "Link Payment" screenshot from the First Circuit's Uber case is set out below as it appeared on the *Cullinane* plaintiffs' Apple iPhones alongside the Zumper screenshot as seen on Mr. Melo's Samsung Galaxy S8:



*Id.* at 58; Coyne Aff. ¶ 11.[5]

As seen above, there are multiple notable distinctions, several of which were the basis of the First Circuit's holding that no contract had been made.  *See Cullinane*, 893 F.3d at 62-64.

- The screen that Mr. Melo saw was about 66 percent larger than what the *Cullinane* plaintiffs saw – 5.8 inches versus 3.5 inches measured diagonally.

- The key words advising the user that a contract was contemplated are presented very differently.  For the *Cullinane* plaintiffs, the operative words ("By creating an account Uber account, you agree to the" terms of service and privacy policy) appeared on a single line in a dark gray font on a black background, at the opposite end of the screen from the box where the user would enter a credit card number and tap on a "Done" button in the upper right corner that appeared when the box was populated.  *Id.* at 59.  That gray text was less noticeable than the links to the terms of service and privacy policy.  *Id.* at 63.  In contrast, Zumper's operative text, "By creating a Zumper account you indicate your acceptance of our Terms and Conditions and Privacy Policy," occupied two lines directly below the "Create Account" button and was in a larger font (15px) than the "Create Account" button (14px).  Coyne Aff. ¶ 13; *contrast Berkson*, 97 F. Supp. 3d at 404 (second "sign up" button appeared in upper right-hand corner of page, divorced from notice and hyperlinks).

- Zumper's link to its terms was in blue and thus had the common appearance of a hyperlink; Uber's terms were in white, and did not.  *Cullinane*, 893 F.3d at 63; *cf. Payne*, 2018 U.S. Dist. LEXIS 135020, at *12-13 (enforcing non-underlined blue hyperlinks).

> 5. *The "Browsewrap" Cases Are Similarly Inapplicable.*

Other cases have dealt with so-called "browsewrap" agreements and generally (but not universally) found them unenforceable.  *See, e.g., Nguyen v. Barnes & Noble Inc.*, 763 F.3d 1171, 1175-77 (9th Cir. 2014) (comparing "clickwrap" agreements with "browsewrap" agreements); *Cvent, Inc. v. Eventbrite, Inc.*, 739 F. Supp. 2d 927, 936-37 (E.D. Va. 2010) (same).  These decisions are not in point because Zumper's design choice for the account creation window is **not** a form of "browsewrap" agreement.  A "browsewrap" agreement is one in which

---

[5] The screenshot from *Cullinane* has been sized to match the reported 3.5 inch screen size (measured diagonally) as closely as possible when printed on standard letter size paper.  *See Cullinane*, 893 F.3d at 56 n.3 (discussing screen size).

the terms and conditions are presented only by a hyperlink on the bottom of the page, sometimes along with other hyperlinks to various pages, and do not require an affirmative act of agreement other than continued use of the site.  *See Nguyen*, 763 F.3d at 1175-77.  But, as discussed, Zumper required such an act.  *See* Coyne Aff. ¶ 11 & accompanying screenshot.

## II.      THIS CASE SHOULD BE TRANSFERRED TO THE NORTHERN DISTRICT OF CALIFORNIA.

Regardless of whether the case is stayed pending arbitration, this Court should transfer this matter to the United States District Court for the Northern District of California pursuant to 28 U.S.C. § 1404(a).  This is so because the claims could have been brought in that forum and because transfer is warranted based on consideration of the relevant factors.  The relevant factors to consider when determining whether to transfer a case under § 1404(a) are (1) the weight (if any) due to the plaintiff's choice of forum, (2) witness convenience and access, (3) the convenience of the parties, and (4) the interests of justice.  *See Trs. of the Plumbers & Pipefitters Nat'l Pension Fund v. Plumbing Servs.*, 791 F.3d 436, 444 (4th Cir. 2015).

### A.      The Parties' Agreement Requires Transfer.

Where, as here, the parties have entered into an agreement with a valid forum selection clause that inquiry changes.  *Atlantic Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 63 (2013).  In such a case, the plaintiff's choice of forum is given no weight and the parties' private interests are not considered.  *Id.*  The remaining public interest factors "will rarely defeat a transfer motion."  *Id.* at 64.  The forum selection clause to which Melo agreed is valid and must be enforced.

Federal law, which applies to the question of the forum selection clause in this federal question case, "presumes mandatory forum selection clauses to be prima facie enforceable for claims within their scope 'unless enforcement is shown by the resisting party to be

22

"unreasonable" under the circumstances.'" *Torres v. SOH Distribution Co.*, 2010 U.S. Dist. LEXIS 47448, at \*6-7 (E.D. Va. May 13, 2010) (quoting *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 10 (1972)).  The clause here is plainly mandatory, *see Torres*, 2010 U.S. Dist. LEXIS 47448 at \*8, and plainly applies, Coyne Aff. Ex. D, §§ 4 ("Listing Party" includes brokers), 7 ("Services" includes credit and background reports to "Listing Party"), 14 ("any court proceedings arising out of or relating to this Agreement, the Website or the Services . . . .")  .

Melo cannot meet his burden of showing that the forum selection clause is unreasonable. "A clause is unreasonable if (1) it was the result of 'fraud or overreaching'; (2) 'trial in the contractual forum [would] be so gravely difficult and inconvenient [for the complaining party] that he [would] for all practical purposes be deprived of his day in court'; or (3) 'enforcement would contravene a strong public policy of the forum in which suit is brought[.]'" *Pee Dee Health Care, P.A. v. Sanford*, 509 F.3d 204, 213-14 (4th Cir. 2007) (quoting *Zapata*, 407 U.S. 1, 15-18) (alterations in original).  There have been no allegations of fraud in this case, the Northern District of California is fully capable of providing a fair trial, and there is no federal policy against enforcement.  Nor is the clause the result of "overreach" simply because Zumper offered its terms on a take-it-or-leave-it-basis.  *See Carnival Cruise Lines v. Shute*, 499 U.S. 585, 593-94 (1991); *Torres*, 2010 U.S. Dist. LEXIS 47448 at \*11.

**B.  Even Without an Agreement, Transfer is Appropriate.**

In any case, the Court need not reach the question of whether Melo agreed to Zumper's terms (though he clearly did), because the case should properly be transferred even without that agreement.  Melo could have brought his claims in the Northern District of California, where Zumper has its headquarters.  Coyne. Aff. ¶ 2; Cmplt. ¶ 7.  Melo's claims against Zumper are based on Zumper's business practices and its alleged failure to act, which necessarily would have taken place in California.  *See* Cmplt. ¶¶ 27-35.  As to Trade House Data, Melo had no dealings

directly with Trade House in Virginia, but Trade House did communicate its information in response to Melo's background report request to Zumper in California.  Coyne. Aff. ¶ 33.

Evaluation of the four relevant factors also supports a transfer.  First, Melo's choice of forum should be disregarded because he brings this action as a proposed nationwide class action. *Byerson v. Equifax Info. Servs., LLC*, 467 F. Supp. 2d 627, 633 (E.D. Va. 2006) ("In class actions, 'the named plaintiff's choice of forum is afforded little weight because in such a case, there will be numerous potential plaintiffs, each possibly able to make a showing that a particular forum is best suited for the adjudication of the class' claim.'") (citation omitted).  This is especially so when another proposed class suit with overlapping claims, the *Gonzalez-Torres* action, has been filed in the Northern District.

The second and third factors (witness convenience and access, and the convenience of the parties) support transfer as well.  Were this case to go to trial, the testimony of numerous San-Francisco-based current and former employees of Zumper would be necessary.  Coyne Aff. ¶ 48. Zumper's relevant documents, databases and computer systems are also located in California. Coyne Aff. ¶ 49.  By contrast, Zumper does not have any relevant offices, records, or employees in Virginia or the surrounding areas.  Coyne Aff. ¶ 50.

Finally, the interests of justice favor a transfer.  One highly relevant consideration when assessing the interests of justice is the pendency of a related action.  *Koh v. Microtek Int'l, Inc.*, 250 F. Supp. 2d 627, 639 (E.D. Va. 2003).  "To permit a situation in which two cases involving precisely the same issues are simultaneously pending in different District Courts leads to the wastefulness of time, energy and money that § 1404(a) was designed to prevent." *Cont'l Grain Co. v. Barge FBL-585*, 364 U.S. 19, 26 (1960).  As noted, the pending *Gonzalez-Torres* action in the Northern District of California involves nearly identical claims against Zumper, as it alleges

that Zumper violated 15 U.S.C. § 1681e(b) by failing to maintain reasonable procedures to

ensure the maximum possible accuracy of the consumer credit information it reported, and

violated 15 U.S.C. § 1681g by failing to disclose the source of judgment information contained

in a consumer report upon request.  Coyne Aff. Ex. J.  While Gonzalez-Torres also asserts claims

under California Law that Melo has not, as yet, asserted, there is plainly substantial overlap

making transfer and consolidation efficient.[6]

In addition, the court in that action is already considering a motion to compel arbitration

based on the plaintiff's agreement to Zumper's terms by creating an account.  Unlike this Court,

the Northern District of California may, under the FAA, issue an order compelling arbitration in

San Francisco, the agreed seat of arbitration, in addition to ordering a stay pending arbitration.

*See Am. Int'l Specialty Lines Ins. Co. v. A.T. Massey Coal Co.*, 628 F.Supp. 2d 674, 685 (E.D.

Va. 2009) (court lacked authority to compel arbitration outside district, and transferred to district

in which court could do so).  Judicial efficiency strongly favors decision of the same arbitration

issues by a single judge.

**III.      THE ACTION MUST BE STAYED PENDING ARBITRATION.**

As noted, the Court may for reasons of efficiency defer the issue of contract formation

and arbitration to the Northern District of California following transfer.  However, if the case is

---

[6] *See, e.g., Silver Knight Sales & Mktg. v. Globex Int'l, Inc.*, 2006 U.S. Dist. LEXIS 80909, at
*12 (S.D. Ohio Nov. 6, 2006) ("More importantly, '[t]he fact that a related action is pending in
the proposed transferee district is an important consideration that can override plaintiff's choice
of forum because transfer of the second action will promote judicial economy and avoid the
possibility of inconsistent results.'" (quoting 17 James Wm. Moore, Moore's Federal Practice, §
111.13[1][o][i] (3d ed. 1997))); *Credit Suisse Ag v. Appaloosa Inv. Ltd. P'shp. I*, 2015 U.S. Dist.
LEXIS 120020, at *26 (S.D.N.Y. Sep. 9, 2015) (Plaintiff's choice of forum is heavily
outweighed by "the existence of a related action pending in the transferee court . . . ."); *Miller v.
CareMinders Home Care, Inc.*, 2014 U.S. Dist. LEXIS 59941, at *13 (D.N.J. Apr. 30, 2014).

not transferred, it must be stayed now pursuant to the parties' agreement and the Federal

Arbitration Act.

### A.     Legal Standard Under the FAA.

Section 2 of the FAA provides in relevant part that:

> A written provision in any . . . contract evidencing a transaction involving
> commerce to settle by arbitration a controversy thereafter arising out of such
> contract or transaction . . . shall be valid, irrevocable, and enforceable, save upon
> such grounds as exist at law or in equity for the revocation of any contract.

9 U.S.C. § 2.  This provision reflects "a liberal federal policy favoring arbitration," and courts

"must place arbitration agreements on equal footing with other contracts and enforce them

according to their terms."  *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011)

(internal citations and quotation marks omitted) (consumer claims arbitrable even though a class

action procedure is unavailable); *see also Lamps Plus, Inc. v. Varela*, 139 S. Ct. 1407, 1415

(2019) (class arbitration unavailable absent unambiguous agreement to the contrary); *Am.*

*Express Co. v. Italian Colors Restaurant*, 570 U.S. 228, 233 (2013) (arbitration required even if

unavailability of class action makes claim economically unappealing); *DIRECTV, Inc. v.*

*Imburgia*, 136 S. Ct. 463, 471 (2015) (states may not apply distinct rules of contract

interpretation to arbitration clauses).

Accordingly, the FAA provides that "If any suit or proceeding be brought in any of the

courts of the United States upon any issue referable to arbitration under an agreement in writing

for such arbitration, the court in which such suit is pending, upon being satisfied that the issue

involved in such suit or proceeding is referable to arbitration under such an agreement, shall on

application of one of the parties stay the trial of the action until such arbitration has been had in

accordance with the terms the agreement, providing the applicant for the stay is not in default

in proceeding with such arbitration."  9 U.S.C. § 3.  This directive is mandatory.  *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985).

To invoke the mandates of the FAA, the defendant must demonstrate:

(1) the existence of a dispute between the parties, (2) a written agreement that includes an arbitration provision which purports to cover the dispute, (3) the relationship of the transaction, which is evidenced by the agreement, to interstate or foreign commerce, and (4) the failure, neglect or refusal of the [opposing party] to arbitrate the dispute.

*Galloway v. Santander Consumer USA, Inc.*, 819 F.3d 79, 84 (4th Cir. 2016) (citation omitted).

Each of these elements is clearly satisfied in this case.

**B.      A Dispute Exists Between the Plaintiff and Zumper.**

Melo's complaint, which Zumper denies, creates a dispute.

**C.      The Agreement to Arbitrate Covers Melo's Claims Under the Fair Credit Reporting Act.**

Melo's claims fall within the scope of the arbitration clause.

*1.      Any Objection to the Scope of Arbitration Must Be Submitted to the Arbitrator.*

First, any objections Melo might have as to including his present claims within the scope of the arbitration clause must be presented to the arbitrator.  The arbitration clause in Zumper's terms delegates all issues, including the question of arbitrability, to the arbitrator.  The agreement does so by explicitly incorporating the Commercial Arbitration Rules of the American Arbitration Association.  *See* Coyne Aff. ¶ 27 & Ex. D; These rules specifically provide that: "The arbitrator shall have the power to rule on his or her own jurisdiction, including any objections with respect to the existence, scope, or validity of the arbitration agreement or to the arbitrability of any claim or counterclaim."  *Id.* ¶ 30 & Ex. E (Rule R-7(a)).  "[I]ncorporation of the AAA rules 'clearly and unmistakably' delegates issues of arbitrability to the arbitrator."

*Milbourne v. JRK Residential Am., LLC*, 2016 U.S. Dist. LEXIS 33603, at *12 (E.D. Va. Mar. 14, 2016) (citation omitted).

> ### 2.      The Claims Are Plainly Within the Scope of the Arbitration Clause.

Second, and in any event, the present claims are plainly arbitrable for the same reason that, as discussed above, they are subject to the exclusive venue clause.

### D.      The Agreement Involves Interstate Commerce.

The third factor required to invoke the FAA – the nexus to interstate commerce – is also satisfied.  "Commerce" within the act runs to the full extent of the Constitution's Commerce Clause.  *Allied-Bruce Terminix Cos. v. Dobson*, 513 U.S. 265, 270 (1995).  Melo alleges that he is a Virginia resident.  Cmplt. ¶ 6.  As noted, Zumper is a Delaware corporation, headquartered in San Francisco, California, that does business through its website throughout the United States and Canada.  Coyne Aff. ¶ 2.  That is more than enough.  *See Branchville Mach. Co. v. AGCO Corp.*, 252 F. Supp. 2d 307, 310 (E.D. Va. 2003).

### E.      The Plaintiff Refused to Arbitrate this Dispute Voluntarily.

The fourth factor required to invoke the FAA – one party's refusal to arbitrate – is also satisfied.  Melo filed this action (and his earlier one) despite the valid agreement to arbitrate.

## Conclusion

For the reasons stated above, defendant Zumper, Inc. respectfully requests that the Court transfer this action to the United States District Court for the Northern District of California and enter an order staying this case pending the resolution of this motion and any subsequent arbitration pursuant to the parties' agreement and the Federal Arbitration Act.

Dated:  September 24, 2019

Respectfully submitted,

 /s/ *Lauren E. Fisher White*
Craig T. Merritt
Virginia State Bar No.  20281
Lauren E. Fisher White
Virginia State Bar No. 80360
909 East Main Street, Suite 1200
Richmond, Virginia 23219-3095
Telephone: (804) 697-4100
Facsimile: (804) 697-4112
cmerritt@cblaw.com
lfwhite@cblaw.com

John A. Shope (pro hac vice)
Kevin J. Conroy (pro hac vice)
FOLEY HOAG LLP
155 Seaport Boulevard
Boston, MA 02210-2600
Telephone: (617) 832-1000
jshope@foleyhoag.com
kjconroy@foleyhoag.com

**Certificate of Service**

I hereby certify that on the above date, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system.

 /s/ *Lauren E. Fisher White*

B5042637.7